We have three cases this morning. And the first is Castleberry v. STI Group et al., number 16-3131. Mr. Swartz, Ms. Walsh, and Ms. Patak? Patak. Okay. Thank you. Whenever you're ready. What happened to Mr. Horowitz? Mr. Horowitz is right there. Okay. Glad to have you here. If you want to stand up and argue too, you can do that. No, I'm kidding. I'm not kidding. I'm semi-serious. Whichever one, you switched yesterday and had you... Yes.  Whatever you guys decide is fine. Thank you, Your Honor. May it please the Court, my name is Richard Swartz of the law firm of Swartz Riddler, and I represent the appellants in this appeal, Antron Castleberry and John Brown, both of whom were the plaintiffs below. I request to reserve ten minutes of my time for rebuttal. At the outset, I apologize for the language I must use this morning, language which will include abhorrent racial slurs. This is language I would not otherwise use. From a policy standpoint, the most compelling of the district court's 12B6 rulings, the most concerning, excuse me, of the district court's 12B6 rulings are the rulings that the court made on plaintiff's retaliation claims. But before I address those rulings, I would like to address the reversible error that the court made earlier in its opinion when discussing plaintiffs' By using the standard regular and pervasive instead of severe or pervasive. Well, part of the problem there is us. I mean, we've said it a number of different ways. I think the Supreme Court has made it pretty clear it's severe or pervasive. That's correct, and I think your court made it very clear since 2006 with the Jensen case that it is severe or pervasive. So that error is still worth discussing just for a moment, though, if I may, because that error is what led the court down the path that led to its incorrect decision with respect to retaliation claims. By finding and holding that regular and pervasive was the standard, the court used that, first of all, used that phrase eight times in discussing the hospital work environment claim. And the court concluded that section by stating, under the regular and pervasive standard, the single use of a racial epithet cannot by itself give rise to a plausible harassment claim under section 1981. This is on page 16 of the court's opinion. So by concluding that, which is not the standard, because certainly if it's severe or pervasive, severe means it could be one incident, and courts have held that, and I'll address that in a second. Can I just ask one question? Sure. Did you consider bringing this as a Title VII claim? We wanted to go straight to court. We brought it as a 1981 claim. I do not recall specifically our thinking a couple years ago when we brought this case, but we do recognize that 1981 has actually greater remedies available to the plaintiffs. You don't have to go through an administrative process, so we decided to bring it straight to court rather than going through the EEOC first. Then the question becomes, let's assume it's severe or pervasive. What is severe? What does severe mean? Well, I would submit, and again I apologize for this, but I would submit that the use of the word nigger by supervisor, followed by a threat of termination, followed by a singling out of my client, the lone black person present at the site at the time, is severe. However, even if it wasn't severe, but I submit it was, there is no reason for the court's decision to dismiss the retaliation claim. The court, in essence, is requiring a plaintiff, in this case a laborer in Tawanda, Pennsylvania, about an hour and a half north of Scranton, to understand the legal intricacies of when that line is crossed to severe, and that just cannot be. Our civil rights laws expect, and in fact require, that plaintiffs bring their complaints and their concerns forward. That's the underlying essence of Burlington-Farragut decisions, where if the plaintiff sits on their hands and they don't bring their concerns forward, that they lose their rights, even if the conduct is otherwise actionable.  That is correct. However... You brought harassment, discrimination, and retaliation. Now, you talk about retaliation. Which of the three do you believe is your strongest claim? Retaliation. Retaliation, to us, is, and with respect to the district court, is not a close call. What's the causal link? You've got a two-week time span between the complaint, as I understand it, correct me if I'm wrong. Sure. Two-week time span between the making of the complaint and the initial filing, and then they rehire. And what are the circumstances that cause the rehire? And then two months, I guess, about two months after the complaint is made, they're fired on the grounds that there's a lack of work. It's January. It's construction season. I can see a lack of work in January constructing a pipeline. Sure. Well, I'll address causality if Your Honor wants me to. Yes, that's what I want you to. However, I'd like to point out that that's not an issue on appeal right now. The district judge didn't reach that decision. That's right. Can we? The issue on appeal is whether the plaintiff, for retaliation, engaged in protected activity. The causation element, just to briefly address it, is, among other things, the evidence of racial animosity by the high-level supervisor in using the term nigger. But can I only affirm the dismissal of the complaint on grounds other than that reached by the district court? I don't believe there's any grounds for you to do so. Okay. The timing is such our clients have been there for two and a half years, over two and a half years. They started in March of 2010. And then come December of 2012, on the heels, within weeks, two weeks of their complaints, all of a sudden they're chosen for termination and they're not given a reason. They would not give a reason. And to me, and I think to the reasonable person, that speaks to, there's a causation element that is at least deserving of discovery. How do you distinguish their situation from the Clark case? Okay. The Clark case, thank you. The Clark case, first of all, if anything, it benefits us. The Clark case certainly spoke of the severe or pervasive standard. Two, the Clark case solely held that the single incident in that case, in that case, was not enough to create a reasonable belief that they were complaining about actual conduct. If it wasn't enough in that case, why isn't it enough in this case? Okay. In that case, the facts are that there were three individuals whose job was, their administrative HR, administrative personnel, whose job was to review psychological evaluations for applicants. And in reading these evaluations, the supervisor read a comment that the applicant had apparently said to a co-worker, I hear that making love to you is like making love to the Grand Canyon. The supervisor then asked, looking toward the plaintiff, asked, do you know, I don't know what that means, words to that effect. At which point the co-worker of the plaintiff, who is on the committee, said, I'll explain to you later, and the co-worker and the supervisor chuckled. In the reading case, in the Clark County case, the plaintiff wasn't fired, for one thing. Two, the plaintiff, but the plaintiff did complain about that, and the court held that the facts of the circumstances were significantly, the plaintiff admitted that she wasn't offended by the comment. The plaintiff admitted, this is in the court's opinion, that she was admitted that she was not offended at all by the conduct, that she's used to this, she's something she read. It's something that she read and it's part of her job to read psychological profiles or evaluations of the applicants. Here, in contrast, our client was offended, as he should be. The use of the word nigger is as offensive as it can be to anyone, and in particular I would submit to African Americans. And this was followed, not the use of the word nigger, but followed by a threat, a threat of termination if the cows got out. And on top of it, our client was fired within two weeks. I think that this case is just very different. What about the district court's interpreting? I'm sorry? What about the district court's interpreting or using language suggesting that there may be perfectly neutral and non-discriminatory reasons for a plaintiff's job assignment? Is it the proper matrix of 4B6? That's a very problematic matrix, yes. The district court is inferring, taking the inferences from the complaint in favor of the defendants. And the district court did that elsewhere, too, in the discrimination case. And we've talked about the hospital work environment case a little bit. We've talked about the retaliation case a fair amount. In the discrimination case, the district court said that there's no evidence of racial animos. So why should I uphold this? That was found. I'll get that when I return if I can't find it quickly. Here we go. On page 18 of the district court's opinion, the court said, although termination would unquestionably be an adverse employment action, plaintiffs have failed to allege a factual basis from which a discriminatory animos can be inferred. What's that? The supervisor two weeks earlier used the word nigger in front of them and then in the same breath threatened termination. In addition, there are other facts that I've discussed, including the job assignments, how plaintiffs were asked to clean around pipes despite their experience in the field. What about the entries on the logs? The entry on the logs are also evidence, we submit, that should have been considered by the court. Basically that on the logs there was repeated statements to the effect, don't be black on the right of way. All right. We'll get you back on rebuttal then. Thank you. Thank you. May it please the court. My name is Donna Walsh. I represent Chesapeake Energy Corporation. Controlling Supreme Court precedent compels the conclusion that appellants have no viable claim for relief. Eight times in a span of four or five pages, the district judge used the phrase regular and pervasive. His analysis finished with that statement, regular and pervasive. How can we affirm when it's evident he applied the wrong standard? I disagree, Judge Anastasiad. He applied the wrong standard. He did use the wrong phrase, and he did it because, as Judge Amber pointed out earlier, he did it because Well, he never used the correct phrase. He did not use the correct phrase, but he did apply the correct standard, which is the standard as it is set forth in Harris and Farragher and Creeden. All of those cases hold very clearly that a single incident or The Supreme Court has said that it's Maybe we've messed it up quite a number of times in various panels, but the Supreme Court and suitors and Morgan and I guess Harris has said that it's severe or pervasive. That's the test. And there is a difference between pervasive and regular versus severe or pervasive. And I don't know anything to do other than on that, at least on harassment, to send it back. I disagree, Your Honor, and here's why. The standard, as the Supreme Court said in Harris and Farragher and Creeden, is that mere utterance of an affidavit which engenders offensive feelings is not actionable. That was the holding in Harris, so that was their remark in Harris. Isolated incidents are not enough. That's what the Supreme Court said in Farragher. It's not just the one term, one use of the word nigger. It's also the references in the laws about being black on time. It's the work assignments. So is your analysis based solely on the word nigger or is it in totality the circumstances? No, but that's what the appellants are asking the court to do. If we factor all of that into the equation, could it be both severe and pervasive? No, Your Honor. No. It can't be because, again, the court has said that isolated incidents, sporadic use of offensive language. The question they're asking is not restricted to one isolated incident. It was the totality of the circumstances these gentlemen were confronted with on the job site. Could that be construed as severe or pervasive? No, and again, it's one comment, the use of the n-word. It's one action or one series of actions. They're alleging that someone wrote, don't be black on the right of way. We don't know who wrote it. We don't know when they wrote it. We don't know how many times they appeared. Shouldn't that be construed in the plaintiff's favor in 12b-6? Because the district court, from my perspective, kind of reversed the burden here at 12b-6 and interpreted these facts. Go ahead. I apologize for interrupting. No, I believe the district court applied the correct standard, and that is the district court placed the burden on the appellants to state sufficient facts that show not just that relief is possible but that it's plausible. They need to nudge their complaint past that point, and they haven't done it. Wait a minute. How is this not plausible? I mean, put yourself in their position. First of all, the arrow points their way on a motion to dismiss, and the court here is saying, nope, there's no way they can possibly win, despite the fact that I'm supposed to accept what they say is true. There's a whole lot of material here that indicates that there may have been harassment, there may have been discrimination, and there may have been a retaliation. And in your world, what does it take to be severe then? Well, there needs to be conduct that occurs on a pervasive or regular basis such that it alters the terms and conditions of employment. And this court in the Supreme Court. What does the word severe mean? You haven't answered that question. Isn't it something different than pervasive? It is something different than pervasive. And I'll tell you what it is not, Judge Vannesky. It's not a single use of the N-word, and it's not someone writing multiple times on a sign-in sheet, don't be black on the right of way. How about getting fired when you complain about it? That doesn't change the terms of employment? Well, the standard, and again, we're stuck with the standard that the Supreme Court has given us, and that is that a complaint about a single remark is not sufficient  and conditions of employment. That's an important point. So no reasonable person would find that the use of the word nigger in the workplace is something that you can go complain about? Well, the Supreme Court has said that a single incident is not something that a reasonable person would conclude fundamentally alters the terms and conditions of employment. That's the holding in the Clark County case, and that's the holding that applies here. The facts in Clark are radically different than the facts in this case. They're different, but it comes down to a single incident. And it was clear that in Clark they restricted the holding to the facts in that incident. They didn't suggest that a single incident across the board is not actionable. They confined the decision to the facts of that particular situation. That's true, but the holding in the other cases that I've mentioned, the holding in cases by this Court, including the King case, is that a single offensive remark, a single offensive incident at work is not sufficient. And really I think that the problem here with the plaintiff's, the appellant's theory is that they're asking the Court to create a new standard. To find that when you use a word like the n-word, it's so offensive to African Americans that if you use it just once, that's severe or pervasive. And again, that's not what the Supreme Court has held. It's not what the Supreme Court has established as the appropriate standard. There's no basis in Title VII or in Section 1981 to distinguish among different groups and different offensive remarks like that. The point is that two weeks later they were fired. And the Court guesses that there could be non-discriminatory reasons for them to fire the plaintiffs. In 1286, how in the world can a district court do that? I believe the district court was applying the standard in Twombly and Iqbal and saying that a plaintiff needs to come forward with sufficient facts to nudge the complaint over the line. No, no, no, you just flipped Iqbal on me. Iqbal says you have to plead something that's plausible. You can't go supplying the reasons for the other side when they don't necessarily even tell you that those are the reasons. No can do. I believe in Twombly the Court held that if there are two explanations or several explanations for an event, it's up to the plaintiff to come forward with sufficient facts to establish that the one they'd like to advance is the plausible or a plausible. And somehow they haven't here? I believe they have not. Again, I think it comes down simply to the standard is there needs to be more than an isolated remark, a single offensive utterance, or even a group or a series. So what would it take? For example, in some of the cases that were cited in the briefs, if the appellant came to work every day or were frequently subject to offensive remarks, different remarks by the same supervisor or by different supervisors. Entries in the logs, not enough? No. Coupled with the use of the word nigger, not enough? No, under the standard as it's announced by the Supreme Court and as adopted by and implemented by the EEOC. What about the EEOC guidance manual that says that severe can be a single instance of the use of the n-word? I don't believe that that's what the EEOC manual says. Well, let me read it to you then. Examples of the type of single incidents that can create a hostile work environment based on race include an unambiguous racial epithet such as the n-word. And the cases that the EEOC cites for that proposition involve much more than a single offensive use of the n-word. So to the extent that that's what the EEOC is suggesting, the cases that it cites do not support that conclusion. And no one is suggesting that the use of the n-word would be appropriate or is acceptable in the workplace. Of course it is not. But the court has set a standard that the conduct itself must be severe or pervasive in a single instance of the use of an offensive epithet. If it is not appropriate, why then should a worker who complains about the use of the n-word be protected against retaliation? Well, again, the Supreme Court in the Breeden case has said if you complain about a single remark, that is not sufficient to constitute protected conduct and it doesn't give you that protection. But in this case there are different, I guess there are additional facts that need to be considered. And that is that although they claim that they were terminated a couple of weeks after this incident, they were immediately rehired and they also claim that they were discharged six weeks later. And they say, again, it was based in part, at least, on their race. But they've not alleged any facts, any circumstances, anything within the appropriate scope of Columbia or Iqbal to support those conclusory allegations. Thank you. So we'd ask that the court affirm and find that the district court properly. Go along with one other question. I asked, I said the court surmised what possible reasons there might be for these persons' non-discriminatory reasons for their termination. And the point is I don't see anything that you can make those up. And even if you were correct, you could. Aren't the plaintiffs then afforded the opportunity to rebut those reasons as pretextual under McDonnell-Douglas? They are, Your Honor. But first they need to get through the door. They need to nudge a complaint past the line that makes their allegations plausible. Speaking only for myself, it's pretty hard to say for me that they're not getting through the door. Your Honor, again, I disagree based on the holdings. It may not be the policy that we'd like to apply in the workplace, but it is the law as the Supreme Court has handed it down. It's the law as this court has implemented it. And respectfully, there are other ways to address issues like this. There's internal discipline within the workplace. There are other ways to eradicate and to address this type of crime. Well, they complained and they got fired, so it's a little bit hard for you to say there are other ways for them to pursue this. Well, you didn't have a reasonable basis for making a complaint. What should they have done? Well, they did exactly what they should have done. They complained. And what happened was exactly what should have happened. The harassment ended. The appellants are not alleging that they had any further contact or communication with Ms. Bennett. They're not alleging that they were subject to any additional offensive remarks. They do claim that they were terminated, and then they were rehired, based on a conclusion that they shouldn't have been terminated in the first place. And they offer their own opinion, a bare conclusion, that their termination two months later had something to do with it. In fact, what they're saying is they're making a number of allegations, and there's a whole lot of smoke. In fact, they're saying there's fire. And you're saying that they don't even get a chance to go to the jury to prove that that's a whole lot of smoke, at the very least, leads to fire. And, for example, you said the harassment stopped. Well, maybe the words stopped, but they were canned two weeks later. It's almost like last hired, first fired. Now, you may have a good case. You may prevail. But these seem to be the types of things that a jury should sort out, or if it's a judge trial, a prior fact should sort out. And, at the very least, it does call for a clarification of the test that we use, which has to be what the Supreme Court gives us. And I don't have any further questions. Anyone else? No. I just said that they wouldn't even let him take discovery in this case. This is dismissive 12b-6, right? That's correct. All right. They were permitted three opportunities to amend their complaint,  The judge is applying the standard at every stage, correct? I don't believe so. He wrote in the disjunctive at every stage, correct? He quoted the wrong language, and the language is in the conjunctive. However, he applied the right standard. And, for those reasons, we submit that the decision should be affirmed. Okay. All right. Thank you. Thank you. This way, sir. May it please the Court. My name is Terri Paytack, and I represent STI in this matter. Your Honors, of course, I have an argument prepared, but if I might just address some of the questions that you asked Ms. Walsh, I'd like to do that. STI's argument is virtually identical to the argument that Ms. Walsh makes on behalf of Chesapeake, with one exception, of course, and that's that Mr. Cappleberry and Mr. Brown were employed by STI. STI had the authority to hire and to fire these individuals. On the other hand, Ms. Bennett, the woman who allegedly made the remark, was not an STI employee. She was employed by Chesapeake. Chesapeake had no authority over her employment. When did STI learn that there were issues at work that possibly could be harassment, possibly could be retaliation, possibly could be discrimination? The first and only time that STI learned of anything of that nature was the complaint that was made in November of 2012, when the complaint was made that Ms. Bennett made one single offensive remark. There were no complaints about any of the things that are alleged in the complaint. The appellant never complained about the alleged don't be black on the right of way on the sign-in sheet. Who had access or who controlled that sign-in sheet? Was it Chesapeake or STI? Your Honor, I have no idea. I'm sorry to say we don't know anything about that sign-in sheet. Do you agree that that statement, don't be black on the right of way, creates an inference of discrimination, or creates an inference of racial animus? I'm not sure what the answer to that is. I don't know what that means, what that remark means. On the face of the complaint, we're at 12 v. 6. On the face of the complaint, how should one interpret that? I alone, that comment may be an inference of racial animus. You couple it with the use of the N-word and the work assignments. Does that get you beyond the threshold of 12 v. 6? I don't believe it does because we're talking about a hostile work environment. The question you're asking is whether that's harassment that creates a hostile work environment. Do you agree with Ms. Walsh's argument that the judge misstated the standard by writing or, I mean by writing and, but applied the right test? Well, I agree that the judge misstated the standard. And the standard is written, in many decisions, the standard is written as severe and regular. We understand the standard is severe or pervasive. You ask the question, what is severe? What would be severe conduct? What would be pervasive conduct? In the context of a 12 v. 6, the facts allege in this complaint do not survive a challenge in your matrix. I do not believe that they do, Your Honor. If you said in answer to Judge Vanesky, I don't know, that means that there's some doubt. That normally means you let a jury sort it out. You make your best arguments, they make their best arguments. So when you say, I don't know, that there is a great area of doubt, how in the world can a court sort it out or is allowed to sort it out at 12 v. 6? Your Honor, the case law tells us that we look at the totality of the circumstances. And the totality of the circumstances in this matter are the three allegations that we're discussing. The one comment that was made by Ms. Bennett, the comment made on the sign-in sheet, and the fact that they claim that they received different assignments based on their race. Those three things, the totality of those circumstances under the case law that we've seen from this court and from the Supreme Court does not rise to the level of actionable harassment, actionable hostile work environment under Section 1981. But the retaliation claim, if you add the fact that they got fired when they complained. Your Honor, I would say that they got fired two weeks after the complaint. They complained November 2012. They were terminated approximately two weeks later and then returned and then continued to work until the work on the pipeline ran out and they were terminated for lack of work. There is no allegation that anything occurred after they made their complaint. SBI did what it needed to do. They complained to Glenn Wyatt, their supervisor. How do we know at 12 v. 6 that the reason for the termination was lack of work? How do we know that at 12 v. 6? That's mentioned in the complaint, Your Honor, that they were terminated for lack of work. That's what they were told, right? That's what they were told. They were brought back and they continued to work. And as this court ruled in, sorry, I'm going to have to put my glasses on to look at this one. What did it call out? In the town of Hamilton, there was a plaintiff in that case who failed to allege that any harassment occurred in the three weeks from the time he made the complaint until he was terminated and that was held not to be retaliation. I would put forth to this court that in this case, nothing happened. There were no additional complaints after that one complaint that was made to Glenn Wyatt, which was rightfully transmitted, conveyed to Tammy Bennett's supervisor at Chesapeake. And as far as STI was concerned, the matter was closed. There was no further incidents, no further complaints made. Your Honors, we agree with the fact that the use of the term nigger is morally repulsive. There's no question. But there is case law that says that single use of the word does not rise to the level of severe conduct that is actionable harassment. Here it was coupled with the statement that you can't take a joke or your problem is you can't take a joke. Doesn't it suggest that that kind of conduct is okay? The African-American has to be able to take that. Doesn't it suggest that you're putting that person in their place? I don't believe it does, Your Honor. I don't believe that that suggestion in any way condones that type of remark. And if I might, the remark that Ms. Bennett made was made as a landowner. She was not speaking as a supervisor. And if a cow gets through, you're fired. So now she's not talking as a landowner, is she? Well, I would liken that, Your Honor, if I might, to a customer who threatens to an employee. I'm going to call your manager because I'm not happy with your service. But the plaintiff alleges she had the authority to fire people. And we have to accept that as true. I think that's where the distinction is blurred, Your Honor, when the plaintiff alleges that she had authority to fire. There are two differences. The plaintiffs were hired by STI. They were fired by STI. STI had no authority over Tammy Bennett. And I don't believe that Tammy Bennett had any authority over the plaintiffs. In any event, Your Honors, appellants have this court reverse the well-reasoned decision of the Middle District, but also to hold to conclude that a single use of a racially offensive remark rises to the level of harassment under Section 1981. And I believe, Your Honors, that that would be in direct contravention to the Supreme Court rulings, the rulings in Harris, the rulings in Farragher, the ruling in Breeden, where this... You keep going back to the one incident, but there were several incidents here. Right? The conversation Judge Banansky just referenced, the entire conversation, not just the use of the word, and there were the entries on the logs. The only things the plaintiffs complained about was that single use of the word by Ms. Bennett. That is the basis for their retaliation claim. They complained about nothing about a log. They did not complain about their assignments. In fact, they claimed that they were the only African American employees on this crew, that part of the crew that they alleged they were unhappy with. That contradicts their statement that they were assigned to that crew because of their race. The race was not a factor. They were the only African Americans on that crew, along with other non-African Americans. They alleged that they were more experienced at pipeline construction than others, and yet they were not assigned to pipeline construction. They were assigned to cleanup work. Your Honor, their allegation... That's the allegation, and we should accept that as true, shouldn't we? Yes, but we should also accept as true the fact that they alleged they were hired as general laborers. They were not hired as pipeline workers. And we also have this statement in the sign-in sheet that says, Don't be black on the right-of-way. And we don't know whose sign-in sheet that was. And I would still, Your Honor, I would still state that those three incidents do not rise to the level of hostile work environment under the case law that we know. Thank you very much. Thank you. We'll get Mr. Schwartz back in rebuttal. Thank you, Your Honor. Just a couple of quick points. The district court did hold correctly that they found correctly that the two entities were joint employers. So for purposes of our motion, there should be no distinction as to who was their direct employer. You asserted a disparate impact claim.  Well, I do. This is an interesting legal thought here, legal analysis here. The Supreme Court in the Humphreys case found that Section 1981 encompassed a retaliation claim, even though Section 1981 does not have in its text a retaliation claim. The Supreme Court did so by looking to 1981's sister statute, 1982, which has been held to have a retaliation claim and thus said, you know, they came out following the Civil War, the Civil War statutes, and the court found that 1981 has a retaliation component. Similarly, 1982, the sister statute of 1981, as referred to by the Supreme Court, had a disparate impact. And while the Supreme Court is yet to address this issue, and while I'm not aware of any circuit-level courts to address this issue, there are decisions that say 1981 concerns purposeful or intentional discrimination. I'm not sure if this really has been answered. And thus, especially since the district court did not even address it, did not even address, mention one word, the court even referred to there being only three counts and not one word as a disparate impact, that that should be sent back down to the court. Our thinking on this case is that if the defendant have, or any company has a policy, that if we're going to try to get through this, what evidence we have, you know, if you complain about the use of the N-word, you can be fired with impunity. And if a woman complains about the use of the C-word, she can be fired with impunity, as long as we do so immediately. Because if we do so quickly, before it happens more than once, then how could a single incident be actionable? And how could that person have, even more upsetting, how could that victim have a reasonable belief that the discrimination laws that are designed to protect our workers could not have been violated? Someone who, as we know, judges disagree, as we know individuals disagree, how could that not be reasonable? And so I think the district court erred and not even addressed the disparate impact. If this court is inclined to rule on that now, then we would accept that, of course. But I'm not, I don't believe that that case has been, the issue of disparate impact in 1981 has been decided. But you are pursuing the claim? Yes. Okay. I'd like to, just a couple other points real quick. There's a case, very strikingly similar to our case, the Green case, out of the Middle District, in which the single use of the N-word in the context of referring to something being nigger rigged was held sufficient to form a faith belief that the laws were, that the conduct was unlawful or was creating a hostile environment. There's also a recent case which none of the parties have brought to the court's attention yet. The case of Asai Ito versus Fannie Mae. I would urge the court to consider that case. It's a 2013 decision by the District of Columbia Circuit Court. And there, there was a single use of the N-word. Do you have the site for that case? I have the site down as 11-7127. 11-7127. Sounds like a docket number. Is that all you got? Yeah, I'm sorry. I apologize. 712F3572. 712F3572. In a panel, all three judges agreed that the plaintiff should survive and be able to have their case heard. But there, there was a single use of the N-word. And Judge Garland, who we now know who Judge Garland is, he wrote that the single incident referring to the use of the N-word might well have been sufficient to establish a hostile work environment, but there was still more. So the court went on to discuss a few of the other incidents relatively, in comparison to the use of the N-word, quite innocuous. In a dissent, not a dissent, in a concurring opinion by Judge Kavanaugh, he makes it very clear that the single use of the N-word is enough, is enough for a plaintiff to have a reasonable basis for believing that the laws are being violated and giving that plaintiff the right. And I would ask this court to take that step and to make it clear that our laws protect, at least in the circuit, our laws protect individuals who have the courage to report a supervisor's use of the N-word. Defense thinking here is that the plaintiff needs to wait and wait and wait. And as I mentioned briefly earlier, this is the opposite of what our civil rights laws and employment context are about. We want to stop harassment in the workplace and not just punish it. We want to stop it. And by stopping it, that's encouragement of reporting and reporting early. If the court has no further questions for me, I am done. Thank you. Thank you to all counsel, and we'll take the matter under advisement.